IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

JOSEPH MILLER LANKFORD,

        Petitioner,

   v.

JAMIE MILLER,

        Respondent.

Case No. 2:15-cv-01118-JE

FINDINGS AND RECOMMENDATION

Julie Vandiver
Assistant Federal Public Defender
101 S.W. Main Street, Suite 1700
Portland, Oregon 97204

        Attorney for Petitioner

Ellen F. Rosenblum, Attorney General
Samuel A. Kubernick, Assistant Attorney General
Department of Justice
1162 Court Street NE
Salem, Oregon 97310

        Attorneys for Respondent

1 – FINDINGS AND RECOMMENDATION

JELDERKS, Magistrate Judge.

Petitioner brings this habeas corpus case pursuant to 28 U.S.C. § 2254 challenging the legality of his Coos County murder conviction dated January 27, 2011. For the reasons that follow, the Amended Petition for Writ of Habeas Corpus (#90) should be denied.

## BACKGROUND

On July 31, 2010, Petitioner attended a family reunion with his wife, Kelly Twiggs. The two began to argue at the reunion and returned home early. Twiggs and Petitioner were in their bedroom when Petitioner drew a gun and fired three rounds. The final round hit Twiggs in the head, killing her. Petitioner called 9-1-1, and officers responded and administered the *Miranda* warning. Petitioner waived his *Miranda* rights and told the responding officers that Twiggs had made him angry, causing him to attempt to shoot the screen of the computer she was using. He claimed that the fatal shot struck a nearby window, ricocheted off the window, and hit Twiggs in the head. Deputy Slater captured this interview in an audio recording.

One of the responding officers, Anthony Byrd, believed Petitioner smelled of alcohol and appeared to be intoxicated. Trial Transcript, p. 58. A test of blood taken at the scene revealed Petitioner's blood alcohol content ("BAC") to be .187. Respondent's Exhibit 163, p. 3. Petitioner was not tested for the presence of other drugs even though he informed the police that he took medication, including diazepam, every night. *Id.*

On August 6, 2010, the Coos County Grand Jury indicted Petitioner on one count of Murder with a Firearm. Respondent's Exhibit 102. During his pretrial proceedings, Petitioner moved to suppress the statements he had made to law enforcement officers on the day of Twiggs' murder. He contended that his waiver of his *Miranda* rights was invalid because his intoxication rendered that waiver and the statements to law enforcement involuntary. Respondent's Exhibit 129, pp. 2-

3. The trial judge listened to testimony that Petitioner appeared to be intoxicated, but was generally steady on his feet, not delusional and not hallucinating. Trial Transcript, pp. 32-33, 41, 53, 55, 60, 64-65. The judge also listened to a recording of Petitioner's 9-1-1 call as well as Deputy Slater's audio recording of Petitioner's interview on the day Twiggs was killed. The judge "was struck with how really composed and articulate and directed [Petitioner] was at that point. He reacted really well, given his blood alcohol content and his circumstances. . . ." *Id.* at 107. The judge found that during the 9-1-1 call, Petitioner "was well oriented as to date, time and place, articulate, specific" and "never lost track of what he tried to accomplish, responded appropriately to questions about where the gun was, those kinds of things." *Id*. at 81. He was "particularly impressed" with Petitioner's ability to "self-calculate his blood alcohol level within like ten or fifteen present of what it actually was."[1] *Id*. at 84. He therefore denied Petitioner's suppression motion.

The case proceeded to trial where the defense focused on the issue of intent. It argued that due to Petitioner's level of intoxication he was guilty of manslaughter, not murder. Dr. Robert Julien testified for the defense and estimated Petitioner's BAC to be .22 at the time of the killing. *Id*. at 524. The jury heard evidence that Petitioner reported taking diazepam on the day he killed Twiggs, including expert testimony from Dr. Julien as to the effects of the drug. *Id.* at 487, 552-53, 555-56. Dr. Julien testified that while diazepam paired with alcohol would have an "additive effect" to a person's inebriation, it would "[i]n no way" increase that person's BAC. *Id.* at 521. He stated that a combination of alcohol and diazepam would function like a drug called "Versed" where "[p]atients look quite normal" but "they cannot sign a surgical consent" because they are unable to process the information. *Id* at 540. On cross examination, Dr. Julien admitted that he was

---

[1] Petitioner had predicted his BAC would be .175 at the time a medical provider drew his blood, and the testing revealed it to be .187. Trial Transcript, p. 420; Respondent's Exhibit 140, p. 48.

3 – FINDINGS AND RECOMMENDATION

unable to say whether diazepam played a role in the case because no such testing had been performed. *Id.* at 575. He further stated, "I cannot understand why blood was not analyzed because it would answer that question." *Id*. at 539.

During closing argument, defense counsel asserted that Petitioner was under the influence of alcohol and an unknown amount of diazepam and did not act with the intent required for murder. *Id.* at 590. The jury found Petitioner guilty of Murder with a Firearm, and the trial judge sentenced him to life in prison with a 25-year minimum. Petitioner took a direct appeal, but voluntarily dismissed the action. Respondent's Exhibits 104 & 105.

Petitioner next filed for post-conviction relief ("PCR") in Malheur County where the PCR court granted the State's summary judgment motion. Respondent's Exhibits 111 & 114. Petitioner did not appeal that dismissal.

On June 19, 2015, Petitioner filed this federal habeas corpus action. Due to issues with Petitioner's representation during his PCR action, the parties agreed to stay this habeas case while Petitioner returned to state court where he reopened his PCR proceedings. Upon reopening that case, Petitioner alleged that his trial attorneys were ineffective when they did not attempt to have his blood tested for the presence of drugs (including diazepam). Respondent's Exhibit 120, p. 4. Fortunately, his original blood sample had been preserved, thus his PCR attorney was able to have it tested. The sample tested positive for the presence of diazepam and indicated he had taken a 10 mg therapeutic dose on the night he killed Twigg. Respondent's Exhibit 133; Respondent's Exhibit 134, p. 10. PCR counsel also secured a new declaration from Dr. Julien wherein the physician stated that in light of the established presence of diazepam in Petitioner's system, his "level of intoxication at the time of the shooting was well about the equivalent of a blood alcohol level of .25." Respondent's Exhibit 134, p. 2.

4 – FINDINGS AND RECOMMENDATION

The PCR court determined that while Petitioner's attorneys failed to exercise reasonable professional skill when they failed to have his blood tested for the presence of drugs, Petitioner had not established that he was prejudiced by the error. Respondent's Exhibit 160, p. 4. The Oregon Court of Appeals affirmed that decision in a written opinion, and the Oregon Supreme Court denied review. *Lankford v. Cain,* 319 Or. App. 539, 510 P.3d 938, *rev. denied,* 370 Or. 214, 516 P.3d 1177 (2022).

On September 25, 2023, Petitioner filed his Amended Petition for Writ of Habeas Corpus (#90) wherein he asserts that his trial attorneys unreasonably and prejudicially failed to investigate and present a comprehensive diminished capacity defense when they failed to secure expert testing of his blood for the presence of diazepam.[2] Respondent asks the Court to deny relief as to this claim because the Oregon Court of Appeals' decision was not unreasonable.

## DISCUSSION

**I.     Standard of Review**

An application for a writ of habeas corpus shall not be granted unless adjudication of the claim in state court resulted in a decision that was: (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A state court decision is "contrary to . . . clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are

---

[2] Petitioner also raises a second claim that his trial attorneys were ineffective when they failed to spend sufficient time with him so as to prepare a proper defense. However, he concedes that this second claim is inexcusably procedurally defaulted thus it is ineligible for federal habeas review. Memo in Support (#103), p. 7.

materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [that] precedent." *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).

Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant relief "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id* at 413. The "unreasonable application" clause requires the state court decision to be more than incorrect or erroneous. *Id* at 410. Twenty-eight U.S.C. § 2254(d) "preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents. It goes no farther." *Harrington v. Richter*, 562 U.S. 86, 102 (2011).

Twenty-eight U.S.C. § 2254(d)(2) allows a petitioner to "challenge the substance of the state court's findings and attempt to show that those findings were not supported by substantial evidence in the state court record." *Hibbler v. Benedetti*, 693 F.3d 1140, 1146 (9th Cir. 2012). A state court renders an unreasonable determination of the facts if it "plainly misapprehends or misstates the record in making its findings or where the state court has before it, yet apparently ignores, evidence that supports petitioner's claim." *Andrew v. Davis,* 944 F.3d 1092, 1107 (9th Cir. 2019) (internal quotations omitted). A federal habeas court cannot overturn a state court decision on factual grounds "unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). This is a "'daunting standard— one that will be satisfied in relatively few cases,' especially because we must be 'particularly deferential to our state-court colleagues.'" *Hernandez v. Holland*, 750 F.3d 843, 857 (9th Cir. 2014) (quoting *Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004)).

///

**II.     Analysis**

Petitioner asserts that his trial attorneys' failure to have his blood tested for diazepam prejudiced him both with respect to his suppression motion as well as the overall outcome of his case. The Court uses the general two-part test established by the Supreme Court to determine whether Petitioner received ineffective assistance of counsel. *Knowles v. Mirzayance*, 556 U.S. 111, 122-23 (2009). First, Petitioner must show that his counsel's performance fell below an objective standard of reasonableness. *Strickland v. Washington*, 466 U.S. 668, 686-87 (1984). Due to the difficulties in evaluating counsel's performance, courts must indulge a strong presumption that the conduct falls within the "wide range of reasonable professional assistance." *Id* at 689.

Second, Petitioner must show that his counsel's performance prejudiced the defense. The appropriate test for prejudice is whether Petitioner can show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id* at 694. A reasonable probability is one which is sufficient to undermine confidence in the outcome of the trial. *Id* at 696. "The likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. 86, 112 (2011) (citing *Strickland,* 466 U.S. at 693). When an ineffective assistance claim relates to the suppression of evidence, a habeas petitioner must show not only that he would have been successful with his suppression motion, but also "that there is a reasonable probability that the successful motion would have affected the outcome [of his case.]" *Bailey v. Newland,* 263 F.3d 1022, 1029 (9th Cir. 2001). When *Strickland's* general standard is combined with the standard of review governing 28 U.S.C. § 2254 habeas corpus cases, the result is a "doubly deferential judicial review." *Mirzayance*, 556 U.S. at 122.

As mentioned above, the PCR court determined that Petitioner established the deficient performance portion of the *Strickland* test with respect to counsel's failure to have his blood tested

for the presence of drugs. Respondent's Exhibit 160, p. 4. The State did not cross-appeal that conclusion, so the only issue for this Court's consideration is whether Petitioner established that he was prejudiced by the error. In assessing this claim, this Court looks to the Oregon Court of Appeals' opinion because it is "the last reasoned decision that resolves the claim at issue in order to determine whether that claim was adjudicated on the merits". *Kipp v. Davis,* 971 F.3d 939, 948 (9th Cir. 2020) (internal quotation omitted).

The Oregon Court of Appeals addressed the prejudicial impact of counsel's error in terms of both Petitioner's suppression motion as well as the jury's verdict. As to the suppression motion, the appellate court concluded that the judge's decision "hinged largely on the recorded 9-1-1 call and recorded interview with petitioner, which persuaded the trial court that petitioner was not so intoxicated that he could not voluntarily waive his rights." *Lankford,* 319 Or. App. at 544. It reasoned that the subsequent determination that Petitioner had diazepam in his system "does not call into question that direct evidence of his condition and, for that reason, could not have tended to have affected the trial court's voluntariness ruling." *Id.* at 544-45.

Petitioner asserts that the Oregon Court of Appeals' decision was unreasonable because, due to counsel's failure to have his blood properly tested, there was no discussion of diazepam during the suppression hearing. He asserts that in light of Dr. Julien's trial testimony about how the combination of alcohol and diazepam could have elevated his level of intoxication without a perceptible effect on the observer, the recordings upon which the trial judge relied did not paint the full picture of Petitioner's level of intoxication. However, nothing in the record suggests that a 10 mg therapeutic dose of diazepam was so medically significant that the judge could not have relied upon Petitioner's statements and actions during the immediate aftermath of the shooting when ruling on his suppression motion. Had the judge been aware of the presence of a therapeutic

8 – FINDINGS AND RECOMMENDATION

amount of diazepam, it is unlikely his ruling on the suppression motion would have changed given Petitioner's demonstrated coherence.

With respect to the jury's verdict, the Oregon Court of Appeals determined that in light of the evidence and arguments that the parties presented to the jury, the omitted evidence "could not have tended to affect the jury's assessment of whether defendant intentionally shot T[wiggs]." *Id.* at 545. It reasoned that even taking Dr. Julien's assessment that Petitioner's BAC equivalent was well above .25% when taking the diazepam into account, this was not the threshold Dr. Julien, himself, established as the level required to preclude formulation of intent.[3] *Id.* It also found that the jury had been informed that Petitioner might have ingested diazepam such that his equivalent BAC would have been higher than reflected in the testing of his blood. It highlighted the fact that the prosecutor acknowledged this during closing argument and "urged the jury to focus on the extensive evidence indicating that petitioner intentionally shot [Twiggs]," none of which would have been impacted by the presence of diazepam in Petitioner's bloodstream.[4] It found that it was

> only merely possible that the omitted evidence could have affected either the trial court's ruling on the motion to suppress or the jury's verdict, given that (1) the trial court and the jury knew that petitioner had a high BAC; (2) the trial court and the jury had contemporaneous evidence of petitioner's condition which demonstrate that, notwithstanding his intoxication, he remained composed and able to communicate intelligently; and (3) the omitted evidence does not allow for a nonspeculative inference that petitioner was functioning in a blackout state. The mere possibility that the omitted evidence might have caused the jury to view the effect of petitioner's intoxication on his ability to waive his *Miranda* rights differently, or caused the jury to view the effect of his

---

[3] Dr. Julien established .30 BAC as the minimum level at which a person could not form intent. Trial Transcript, p. 513; *Lankford,* 319 Or. App. at 545.
[4] The Court of Appeals' decision appears to contain two typographical errors referring to the lack of significance if Diazepam in Twiggs' blood when the appellate court intended to reference diazepam in Petitioner's blood. *Lankford,* 319 Or. App. at 545.

9 – FINDINGS AND RECOMMENDATION

> intoxication on his ability to act intentionally differently, is insufficient to establish prejudice under wither the state or federal constitution.

*Id*. at 546.

Petitioner argues that although Dr. Julien agreed during cross-examination that Petitioner was capable of forming intent, he did so with the qualification that his testimony assumed Petitioner only had alcohol in his system. *See id.* at 521. He also points out that Dr. Julien testified at trial that the addition of diazepam would create considerably more confusion than alcohol, alone, thus the inclusion of that evidence would have supported a recklessness defense. *See id.* at 525.

During Petitioner's PCR proceedings, he had the opportunity to relitigate the diazepam issue with the benefit of two critical pieces of evidence that he had been unable to develop at trial due to counsel's error: (1) his blood sample had been retained and tested positive for a 10 mg therapeutic dose of diazepam; and (2) Dr. Julien was able to opine as to whether Petitioner was able to form intent given the revelation that he had diazepam in his blood at the time he killed Twiggs. Armed with knowledge of the level of diazepam in Petitioner's blood on the night of the killing, Dr. Julien remained unable to testify that Petitioner was too intoxicated to form the intent required to support intentional murder; his Declaration stated only that his BAC "was well above the equivalent of . . . .25" whereas his opinion of the level necessary to preclude formation of intent was .30. Respondent's Exhibit 134, p. 2; Trial Transcript, p. 513; *Lankford,* 319 Or. App. at 545. Had Dr. Julien provided expert testimony at trial consistent with the sworn statements he made during the PCR hearing, it is difficult to see how the jury's verdict would have been more favorable for Petitioner.

The fact that Petitioner had diazepam in his system would also not have overcome the overwhelming evidence showing that he was guilty of intentionally murdering Twiggs. Twiggs'

son was among those home at the time of the killing, and Petitioner told him immediately after the shooting that it had been an accident because the bullet had ricocheted off of a bedroom window and struck Twiggs in the head. Trial Transcript, p. 248. The windows in the room were fully intact with no damage, and Twiggs' son told Petitioner "that [his version of events] was BS . . . [b]ecause we don't have bulletproof windows in our house." *Id.* When Petitioner called 9-1-1, he told the operator, "I shot at the window, apparently reflected out the window to her head." Respondent's Exhibit 147, p. 3. He told Officer Slater that he had fired at the computer on which Twiggs was playing her video game, missed his target, hit the window, and the bullet struck the window and then hit Twiggs in the head. *Lankford,* 319 Or. App. at 541. He told Officers Slater and Officer Wilson that he "was lying on the bed and Ms. Twiggs was sitting in front of the computer . . . about 5 or 10 feet away from the bed" at the time of the shooting. Respondents' Exhibit 136, p. 4.

Putting aside the dubious proposition that a .45-caliber bullet – fired at close range – killed Twiggs after it ricocheted off of a windowpane in Petitioner's manufactured home,[5] his version of events was not credible for another reason. Twiggs displayed visible gunshot powder "stippling" at the entrance wound just in front of her left ear, something that only occurs if a gun barrel is within approximately one foot of the skin. Trial Transcript, p. 226. The forensic evidence established that Petitioner was holding his firearm between one and twelve inches from Twiggs' head when he pulled the trigger, *id.* at 427, and was thus inconsistent with his statements that he was lying on the bed five or ten feet away from Twiggs while firing the shot that killed her. Respondent's Exhibit 136, p. 4; Respondent's Exhibit 140, pp. 15-16, 21. In light of the foregoing

---

[5] During Petitioner's interview with Officers Slater and Wilson, he also speculated that it might have been shrapnel from the computer Twiggs was using that struck her in the head, but the autopsy revealed that a .45-caliber bullet had pierced her skull and traveled through her brain. Respondent's Exhibit 139, p. 351; Respondent's Exhibit 140, p. 25; Trial Transcript, pp. 225, 229.

11 – FINDINGS AND RECOMMENDATION

as well as Petitioner's cogent functioning at the time of the shooting, he has not established that he was prejudiced by his trial attorneys' failure to have his blood tested for diazepam. At a minimum, the Oregon Court of Appeals' decision was not unreasonable, and habeas corpus relief is not warranted.

## **RECOMMENDATION**

For the reasons identified above, the Amended Petition for Writ of Habeas Corpus (#90) should be denied and a judgment should be entered dismissing this case with prejudice. The Court should, however, issue a Certificate of Appealability as to Petitioner's preserved ineffective assistance of counsel claim stated as Ground One in the Amended Petition.

## **SCHEDULING ORDER**

This Findings and Recommendation will be referred to a district judge. Objections, if any, are due within 17 days. If no objections are filed, the Findings and Recommendation will go under advisement on that date.

If objections are filed, a response is due within 14 days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

 8/8/2024  
 DATE

s/ John Jelderks  
John Jelderks  
United States Magistrate Judge